1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF ARKANSAS

3    UNITED STATES OF AMERICA, .   Case No. 4:11-mj-6006-BD-1
                               .
4         Plaintiff,           .   Little Rock, Arkansas
                               .   Tuesday, March 22, 2011
5         v.                   .   2:02 p.m.
                               .
6    JASON WALTER BARNWELL,    .
                               .
7         Defendant.           .
     . . . . . . . . . . . . . .

8
                     TRANSCRIPT OF DETENTION HEARING
9                 BEFORE THE HONORABLE BETH DEERE
                    UNITED STATES MAGISTRATE JUDGE
10
     APPEARANCES:
11
     For the Plaintiff:       PAT HARRIS, ESQ.
12                            US Attorney's Office
                              P.O. Box 1229
13                            Little Rock, Arkansas 72203-1229
                              (501) 340-2621
14
     For the Defendant:       MISTY WILSON BORKOWSKI, ESQ.
15                            James, Carter & Coulter, PLC
                              P.O. Box 907
16                            Little, Rock, Arkansas 72203
                              (501) 372-1659
17
     Court Recorder:          SUZY FLIPPEN
18                            500 W. Capitol, #C150
                              Little Rock, Arkansas 72201
19                            (501) 604-5114

20   Transcription Service:   On the Record Reporting &
                              Transcription, Inc.
21                            3307 Northland Dr., Ste. 315
                              Austin, Texas 70731
22                            (512) 450-0342

23   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

24

25

1                              INDEX

2
                                         Re-     Re-    Further
3                     Direct  Cross  Direct  Cross  Redirect

4    WITNESSES FOR PLAINTIFF:

5    Steven F. Burroughs        6      25

6    Jimmy Wayne Eaken         34      39     43      43

7    Wendy Treybig             46      53

8
     WITNESSES FOR DEFENDANT:
9    NONE

10

11                                      Marked      Received
     EXHIBITS:
12   Government's

13   G-1                                 15          18

14   G-2                                 19

15   G-3 and G-4                         14          15

16   G-5                                 15          18

17   G-6                                 24          24

18   G-7                                 71          71

19   Defendant's:

20   D-1                                 35          39

21   D-2 through D-6                     49          49

22   D-7 and D-8                         51          52

23

24

25

1    LITTLE ROCK, ARKANSAS, TUESDAY, MARCH 22, 2011, 2:02 P.M.

2         THE BAILIFF:  Everyone please rise.  United States

3    District Court for the Eastern District of Arkansas is now in

4    session, the Honorable Beth Deere presiding.  Please be seated.

5         THE COURT:  Good afternoon.

6         MR. HARRIS:  Good afternoon.

7         MS. BORKOWSKI:  Good afternoon, Your Honor.

8         THE COURT:  Today is March 22, 2011.  We're here in

9    the case of United States v. Jason Walter Barnwell, case number

10   4:11MJ6006, and the purpose of our hearing this afternoon is to

11   take up the issue of bond for Mr. Barnwell.

12        The crimes charged in this case, on the face, do not

13   create a presumption for detention.  In this country, of

14   course, everybody is presumed innocent until proved guilty, and

15   there is a presumption that people who are innocent are not put

16   in jail.

17        However, there are certain crimes that Congress has set

18   out that create a presumption that, because of danger to the

19   community, the Defendant is presumed in need of being detained

20   pending trial.

21        We can spend a while arguing over whether this should be

22   counted as a presumption case because the crimes -- uncharged

23   conduct that is implied by the charged conduct would constitute

24   a presumed -- a presumption case, where it would be presumed

25   that the Defendant would be detained.

1        So we can spend some time arguing about that, Mr. Harris,

2   or you can go first.

3        MR. HARRIS:  You know, if I was younger, I'd sit up

4   here and argue the law with you.  But I know even it was

5   presumption, it works out better if I go first.

6        THE COURT:  The flow, the flow.  I'm going to let

7   everybody say all they want to say, and I'm not holding you to

8   any rules of scope of cross and all that.

9        So in that I'm going to let everybody say all they want --

10  and I do want to hear some evidence in this case; I don't want

11  us to start off at a stalemate, so I'd like to hear from you if

12  you'd go first.

13       MR. HARRIS:  And I sent you an e-mail through Ms.

14  Flippen, and I sent Ms. Borkowski a copy, too, and I trust you

15  got it, and that kind of put out my -- the theory, and I think

16  it's accurate, but it doesn't really matter right now.  Let me

17  put on my evidence.

18       THE COURT:  That's right.  And, Ms. Borkowski, you

19  did get a copy of Mr. Harris's e-mail to me?

20       MS. BORKOWSKI:  Yes.  Yes, I was aware of that.

21       THE COURT:  And I -- given that we did -- I did some

22  research on this, and, you know, the case that you've cited

23  does stand for that proposition, but it is a case from

24  Florida -- from a district court in Florida, which --

25       MR. HARRIS:  But not in California, I might add.

1    THE COURT:  Not -- it's from the other coast.  But

2    still and all, I -- again, I don't think it's going to make any

3    difference.  There's not a jury here, and I'm going to hear

4    everything everybody has to say.

5         MR. HARRIS:  If I may, with the Court's permission,

6    I'll call Steve Burroughs.

7         THE COURT:  All right.

8      (Pause.)

9         THE COURT:  Would you raise your right hand.

10   Whereupon,

11                    STEVEN FREEMAN BURROUGHS

12   having been first duly sworn, was called as a witness herein

13   and was examined and testified as follows:

14        MR. HARRIS:  Your Honor, I do recognize -- and I know

15   that the Court does and Ms. Borkowski does -- that this is a

16   detention hearing, and hearsay is permissible.

17     I have some documents that I'm going to introduce through

18   Mr. Burroughs.  I have copies for the Court if I could go ahead

19   and give the Court copies.

20        THE COURT:  You may, and before we go much further,

21   let me ask, I assume -- from reading the file I'm assuming that

22   you are asking for detention based on danger to the

23   community --

24        MR. HARRIS:  Correct.

25        THE COURT:  -- and not risk of flight.

1          MR. HARRIS:  Correct.

2          THE COURT:  So let's confine our hearing today just

3     to the danger to the community, because I don't apprehend that

4     he's a risk of flight.

5          But -- so just so that everybody's clear, the

6     Government -- whether it's a presumption case or not, there's

7     the ultimate burden of showing by clear and convincing evidence

8     that the Defendant is a -- presents a danger to the community,

9     and it's not my job to guarantee the safety of the public, but

10    just to reasonably assure the safety of the public.

11         MR. HARRIS:  True.

12         THE COURT:  And so that's the standard I'm looking

13    at, so if we can just sort of focus in on that, and I'll be

14    glad to look at your exhibits.

15         MR. HARRIS:  These are the Court's copy.  I gave Ms.

16    Borkowski copies, and I've got copies I'm going to work

17    through.  Is that okay?

18         THE COURT:  Yes, that's fine.

19                         DIRECT EXAMINATION

20    BY MR. HARRIS:

21    Q    Would you state your name, please, sir.

22    A    My name is Steven Freeman Burroughs; I'm a special agent

23    with the FBI.

24    Q    And how long have you worked with the FBI?

25    A    Approximately 13 years.

1    Q    And what are your current assignment now -- your duties?

2    A    I'm assigned to the Joint Terrorism Task Force, to work

3    domestic terrorism matters.

4    Q    Okay.  Are you one of the case agents on this matter?

5    A    I am.

6    Q    And did you participate in either the arrest last week of

7    Mr. Barnwell and his co-defendant or the search of his house?

8    A    I participated in Mr. Barnwell's arrest and the search of

9    his home.

10   Q    Okay.  And his house is where?

11   A    In Evening Shade, Arkansas.

12   Q    By Hardy, Batesville?

13   A    It's in Sharp County, between Batesville and Hardy.

14   Q    And have you interviewed Mr. Barnwell?

15   A    I've talked to him several times.

16   Q    Okay.  And have you interviewed other people in relation

17   to this case?

18   A    I have.

19   Q    Are you aware of the prior criminal history of Mr.

20   Barnwell?

21   A    I am.

22   Q    If I may, let me just run through some things.  Are you

23   aware that he has a felony conviction out of North Carolina for

24   larceny and another one for obtaining property by false

25   pretenses, I believe in '06.

1   A    Yes.

2   Q    Are you aware that in Hays County, Texas, he has a

3   burglary of a habitation for which he received ten years

4   Department of Correction?

5   A    That's correct.

6   Q    And that -- he was placed on probation, and it was

7   revoked.  Is that correct?

8   A    That's correct.

9   Q    Out of Bee, B-E-E, County, Texas he has a conviction for

10  possession of a deadly weapon in a penal institution.  He was

11  in prison and got a conviction based -- got three years

12  consecutive.  You're aware of that?

13  A    I am aware of that.

14  Q    And then finally -- I think this is correct.  Finally in

15  Kendall County, Texas he has three priors -- felonies:

16  possession of a controlled substance and two burglary of

17  habitation.  Does that sound right?

18  A    That's my understanding, yes.

19  Q    In 2005 he was arrested in North Carolina for a number of

20  things, one of which included armed terror to the people.  You

21  know what I'm familiar with?

22  A    Yes.  In Hendersonville, North Carolina.

23  Q    And there is a two-page report that the arresting officer

24  prepared.

25  A    Yes.

1   Q     Have you reviewed that?

2   A     I have.

3   Q     Okay.

4         MR. HARRIS:  And, Your Honor, you have a copy of

5   that, and Ms. Borkowski has a copy also.

6         THE COURT:  All right.

7   BY MR. HARRIS:

8   Q     And would you, just for the record, summarize what

9   happened in this arrest in August of 2005 with Mr. Barnwell.

10  A     Yes.  On that August night, from the report it was

11  2:00-something in the morning, the officers were called to a

12  location there in Hendersonville, where they encountered Mr.

13  Barnwell.  They received a call there was a man with a gun.

14        Upon arriving at the location, they found Mr. Barnwell

15  outside his vehicle.  They also located a Ruger Mini-30 assault

16  rifle in a ditch nearby; took Mr. Barnwell into custody and

17  seized the weapon.

18        They also searched the car and found approximately 400

19  rounds of ammunition for the weapon.  During the arrest of Mr.

20  Barnwell and during his transport to the police department, he

21  made several statements to the officers.

22        He was very agitated, apparently very combative, banging

23  his head against the cage in the police car, and had made

24  statements about that he was going to kill black people that he

25  referred to as niggers and that they should have killed him --

1   or the police should have killed him, and that next time that

2   he would send them -- referring to the police officers, send

3   them home in boxes, and made several other derogatory

4   statements about African-Americans.

5   Q    And then when he was finally arrested, he was placed in a

6   cell, and he made a statement -- am I correct? -- that if you

7   put any niggers in jail with me, I'll kill them, too?

8   A    That's what he said; that's what's in the report.

9   Q    Okay.  Now, two of the photos --

10          MR. HARRIS:  May I approach, Your Honor?

11          THE COURT:  You may.

12          MR. HARRIS:  Two of the photos which the Court has --

13   I guess I'll have to mark it here in a second.

14   BY MR. HARRIS:

15   Q    Tell the Court what that is in that photo.  I think it's

16   going to be, Your Honor, the third and fourth photo you have.

17   A    One page contains two photographs.  One is a full picture

18   of the Ruger Mini-30 assault rifle, and the picture underneath

19   that is another photograph of the rifle but just showing the

20   brand of the rifle and the caliber of the rifle, which is a

21   7.62 by 39 caliber.

22          The second page contains two photographs showing the

23   ammunition and magazines which were retrieved out of Mr.

24   Barnwell's automobile that fit the assault weapon they

25   recovered.

1   Q    Now, you're aware that when he was arrested in 2005, he

2   already had prior convictions from Texas in '92 and '93.

3   A    Yes, I'm aware of that.

4   Q    Now, when's the first time you met Mr. Barnwell?

5   A    The first time I met Mr. Barnwell was in June of 2010.  We

6   had received information from a person who said that they had

7   observed a gathering of skinheads in Mr. Barnwell's residence

8   in Evening Shade.

9        Myself and Agent J.C. Garrett went to talk with Mr.

10  Barnwell and Ms. Treybig, his girlfriend, and to ask them if

11  they became aware of anyone who was planning to do harm to

12  anyone or, if they knew of anyone who had done harm to someone,

13  for them to please contact us.

14       We make an effort to go out and contact people who are in

15  positions to come in contact with persons who historically have

16  been involved in violence, whether it be skinhead groups or

17  whatever.  If there is a historical precedence for people being

18  involved in violence in those groups, we'll go to people who

19  are involved in those groups and ask them to help us prevent

20  violent acts by contacting us.

21       I'm sorry.

22  Q    I'm sorry.  And you talked to Mr. Barnwell.  What did he

23  say about -- does he ordinarily fight cops?

24  A    Yes.  He made the statement that normally he fights police

25  officers but that me and Agent Garrett had presented ourselves

1    very respectfully and was respectful to him and his girlfriend,

2    and they talked to us; actually gave us a walk behind the

3    property to the river and showed us how their house is

4    positioned on the property.

5    Q    Okay.  Back in May of last year, when you went to his

6    house, do you remember seeing something hanging from the porch?

7    A    I do.  The -- in my conversation with Mr. Barnwell, he had

8    told me that he was part of -- a skinhead and part of Blood and

9    Honor, and that he's very proud of that but that it was

10   something about white pride, not necessarily hate.

11        And I noticed on the porch -- on their porch -- front

12   porch was hanging a black Ken doll in a noose.  And I made

13   reference to the doll, and he just smiled and didn't respond.

14   Q    When you say a Ken doll, are you talking about Barbie/Ken

15   kind of thing?

16   A    Yeah, like a Ken or Barbie type doll, except it was an

17   African-American doll, and it was hanging by its neck from a

18   noose.

19   Q    Okay.  Do know what ATB is?

20   A    Yes.  ATB is Aryan Terror Brigade.

21   Q    Did Mr. Barnwell say anything about that?

22   A    Not on that day, no.

23   Q    Now, in May of 2010 did you talk to somebody else about

24   Mr. Barnwell?

25   A    (No response.)

1    Q     May or June.  Maybe I have it wrong.

2    A     I've talked -- we've talked to so many people about Mr.

3    Barnwell that I'm not exactly sure who you're talking about.

4    Q     Okay.  In May of 2010 -- I think this is the right

5    month -- May of 2010 did you find a police report from an

6    assault in Batesville of a black man?

7    A     We did.  During the course of our investigation on this

8    matter, we learned of another incident in Batesville, Arkansas,

9    that occurred in May of 2010.

10        And after talking to this person, they told us of an

11   incident that Mr. Barnwell was involved in, and Ms. Treybig,

12   where they and some of their fellow associates who are Aryan

13   Terror Brigade members or associates, drove from the Barnwells'

14   residence in Evening Shade to Batesville and located two

15   African-American men walking through a parking lot.

16        And when they saw the men in the parking lot, they

17   stopped, and one of their associates exited the vehicle and

18   assaulted one of the black men from behind by striking him in

19   his nose, which caused his nose to burst and to bleed.

20        From looking at the police report, talking to the

21   officers, and also interviewing the victim, we found out that

22   during this incident that the men in the car exited -- it was a

23   total of seven people in the car:  two female and five men.

24        The men in the car exited the vehicle.  At least four of

25   them surrounded the black male, and derogatory statements were

1   yelled that -- to the effect, we're going to kill us a nigger;

2   get the gun out of the car.

3       Also during the incident somebody yelled -- and I believe

4   this was actually before the strike -- White Pride, and, I hate

5   niggers.

6   Q   And do you know if Mr. Barnwell was one of the five

7   people?

8   A   He was.

9   Q   And do you know who the other people were, too?

10  A   Yes.

11          MR. HARRIS:  May I approach, Your Honor?

12          THE COURT:  You may.  Do you want to go ahead and

13  mark these two before we lose track?

14          MR. HARRIS:  If we call those 3 and 4.

15          THE COURT:  Okay.  Government's --

16          MR. HARRIS:  Exhibits 3 and 4.

17          THE COURT:  All right.  Government's 3 is the picture

18  of -- the full picture of the assault gun, and the bottom half

19  has the closeup, and then -- that will be G-3.

20  (Document marked Government's Exhibit 3.)

21          THE COURT:  G-4 will be the ammunition clips.

22  (Document marked Government's Exhibit 4.)

23          THE COURT:  All right.  Any objection to receiving

24  these exhibits?

25          MS. BORKOWSKI:  Which ones did we enter?  Just the

1    last three?

2              THE COURT:  Three and four, which --

3              MS. BORKOWSKI:  These?

4         (Pause.)

5              THE COURT:  Okay.  No objection, Your Honor.

6              THE COURT:  All right.  They'll be received.

7    (Documents marked Government's Exhibits 3 and 4 received.)

8              MR. HARRIS:  May I approach?

9              THE COURT:  You may.

10             MR. HARRIS:  Your Honor, this will be Exhibit 1.

11             THE COURT:  All right.  This will be G-1.

12   (Document marked as Government's Exhibit 1.)

13   BY MR. HARRIS:

14   Q    Do you know who that is?

15   A    Yes.  This is a photograph of Wendy Treybig.

16   Q    Okay.  Do you know it because you recognize her?

17   A    I do.

18   Q    Okay.  And have you interviewed her or met her before?

19   A    I have.  She's in the courtroom today.

20   Q    Do you know -- when was this photo taken?  Do you know?

21   A    I don't know when the photograph was taken.

22   Q    How did you get it?

23   A    I was provided the photograph through e-mail from a FBI

24   task force officer in North Carolina.

25   Q    Now, you -- on January 27 of this year, you went back to

1    interview Mr. Barnwell.  Is that correct?

2    A    That's correct.

3    Q    And what was the purpose for interviewing him at the time?

4         MR. HARRIS:  I'm sorry, Your Honor.  If I may, may I

5    approach again?

6         THE COURT:  You may.

7         MR. HARRIS:  Exhibit 5 is the last one, Your Honor.

8    (Document marked as Government's Exhibit 5.)

9    BY MR. HARRIS:

10   Q    Would you tell us what Exhibit 5 is.

11   A    Exhibit 5 is a photograph of Mr. Barnwell, and this was

12   during -- or after his arrest in Hendersonville, North

13   Carolina, in August of 2005.

14   Q    August of 2005.

15   A    Yes.

16   Q    And that was taken by the police department.  Am I

17   correct?

18   A    Yes.  We received it from -- after requesting a copy of

19   the file from the police department.

20   Q    Now, in January of this year you went back and interviewed

21   Mr. Barnwell.  Is that correct?

22   A    January 27, yes.

23   Q    What was the purpose of that?

24   A    The purpose of talking to Mr. Barnwell on that day was to

25   obtain his whereabouts on the night of January 14, when the

1  firebombing took place in Hardy.

2  Q    And what happened when you went up and talked to him then?

3  A    On that day Mr. Barnwell talked to us in the yard of his

4  residence; myself and Special Agent J.C. Garrett talked with

5  him.  During our conversation with him, he denied any

6  involvement in the incident, the firebombing, and bragged that

7  if -- telling us that we knew who he was, we knew what his

8  history was, and that if he had been involved in such an

9  incident, someone would have wound up dead and that --

10 Q    Was he implying that his history is one of violence?

11 A    Yes.

12 Q    And he tell you that he beats people?

13 A    He did make the -- actually he made the statement -- and I

14 don't remember if it was that interview or if it was a

15 subsequent time when we went back in February.  He made the

16 statement that he beats people, he attacks people, but he

17 doesn't throw bombs through their windows.

18 Q    Okay.  And at this time in January did he tell you that he

19 knew how to make an IED?

20 A    He did.  He said that he knew how to make -- he said

21 improvised explosive devices but that he doesn't do that.

22 Q    And what is an improvised explosive device?

23 A    It's -- well, the acronym, like you said, IED, improvised

24 explosive device, is when you take substances that are not

25 manufactured into an explosive device by -- like a military

1    device, but you improvise, you take substances, put them

2    together to make an explosive.

3    Q    Now, you did a search of his house last week, I think,

4    didn't you?

5    A    Last Wednesday.

6    Q    Last Wednesday.  And what did you find in the search?

7    A    We found a number of items.  One of the things we found

8    during the search was a loaded 22-caliber semiautomatic rifle

9    concealed in the barn behind the residence.

10        We also found, I believe it was, seven 22-caliber bullets

11   on the night table beside -- in the master bedroom.  We found a

12   number of neo-Nazi flags posted on the wall.  We found writings

13   by Mr. Barnwell and Ms. Treybig.  We found books pertaining to

14   Nazi Germany, a lot of books pertaining to the SS, to Hitler.

15        We found a number of other things; right now I can't

16   recall what they were.

17              MR. HARRIS:  May I approach?

18              THE COURT:  You may.  Did you offer G-1 and G-5?

19              MR. HARRIS:  If I didn't, I would do so now.

20              THE COURT:  Any objection to G-1 and G-5?

21              MS. BORKOWSKI:  No objection, Your Honor.

22              THE COURT:  G-1 being a photo of Ms. Treybig and G-5

23   being Mr. Barnwell, those will be received.

24   (Documents marked Government's Exhibits 1 and 5 received.)

25              MS. BORKOWSKI:  And we have an objection to the photo

1    that he's -- this.

2            THE COURT:  All right.

3            MS. BORKOWSKI:  The basis of the objection is he

4    doesn't know who took it, when it was taken, or where it was.

5            THE COURT:  And now we're talking about this last

6    photo?  All right.

7            MR. HARRIS:  That's true.  If I could lay a

8    foundation, it might answer some of the questions.

9            THE COURT:  All right.  What's the number?  Let's --

10           MR. HARRIS:  Two -- G-2.

11           THE COURT:  G-2.

12   (Document marked as Government's Exhibit 2.)

13           MR. HARRIS:  I apologize for this, Your Honor.

14           THE COURT:  That's all right.  I just -- Judge Woods

15   would want to know that I was keeping up with the exhibits.

16           MR. HARRIS:  He would be very happy.

17           THE COURT:  I have to keep up with exhibits here.

18       All right.  So let me see if he can lay a foundation.  I

19   don't know what it is.

20   BY MR. HARRIS:

21   Q    You recognize this?

22   A    I do.

23   Q    G-1 [sic].  And how do you recognize it?

24   A    This is a photograph -- or a copy of a photograph we found

25   in Mr. Barnwell's residence during the search last Wednesday.

1          THE COURT:  This is G-1?

2          MR. HARRIS:  I'm sorry.  G-2.  I misspoke.

3          THE WITNESS:  Yes.  Photograph G-2, which depicts Mr.

4    Barnwell holding an assault rifle, which looks like a mini

5    AR-15 or M-4 rifle, was found in his residence by agents during

6    the search on Wednesday.

7    BY MR. HARRIS:

8    Q    You don't know when it was taken?

9    A    I do not know when it was taken.

10   Q    Do you know who took it?

11   A    I do not know who took it.

12   Q    You know where it was taken?

13   A    No.  It looks consistent with the area around Sharp

14   County, but I do not know that.

15   Q    Is that a picture of the Defendant?

16   A    It is a picture of Mr. Barnwell.

17   Q    Is it a picture of Mr. Barnwell holding a weapon?

18   A    Yes, it is.

19          MR. HARRIS:  Your Honor, I'd offer.

20          MS. BORKOWSKI:  I object, for the same reasons.  It's

21   just unrelated to what's going on.  If what we're looking at

22   right now is is he a threat to the community and this is a

23   photo taken from when we don't know, where we don't know, it's

24   completely irrelevant; shouldn't be included.

25          THE COURT:  Do you concede that it's a photo of Mr.

1    Barnwell?

2           MS. BORKOWSKI:  No, Your Honor, I don't concede that

3    at all.

4           MR. HARRIS:  May I ask the witness?

5           THE COURT:  You may.

6    BY  HARRIS:

7    Q    See that man right there?

8    A    Yes.  Mr. Barnwell.

9    Q    And is that the same man as this man in the picture?

10   A    It's the man in this photograph.  Yes, sir.

11   Q    The judge has the color photo.  Right?

12   A    Yes.

13          THE COURT:  All right.  I will receive it for -- over

14   your objection for whatever weight it's worth, realizing I have

15   no way to know -- I'll assume that it was not taken during a

16   time relevant to this lawsuit, but it does appear to be Mr.

17   Barnwell.

18          MS. BORKOWSKI:  Thank Your Honor.

19   BY  HARRIS:

20   Q    Now, as part of the investigation of the firebomb, the

21   Molotov cocktail or -- I don't know if it was a Molotov

22   cocktail or not -- have you interviewed people?

23   A    Yes.

24   Q    Have you interviewed people who told you that they are

25   afraid of Mr. Barnwell and some other the co-defendants?

1   A    Yes.  We've interviewed at least two people who have

2   indicated that they're fearsome -- fearful that if Mr. Barnwell

3   and his associates become aware of their cooperation with us,

4   that -- they are fearful for their family and for themselves.

5   Q    Okay.  Did you interview a wrecker driver?

6   A    Yes.

7   Q    And he came in contact with Mr. Barnwell when?

8   A    Yes.  One of our agents interviewed a wrecker driver that

9   came into contact with Mr. Barnwell on January 31 of this year

10  when they were repossessing the Barnwells' -- one of their

11  vehicles.

12  Q    And what did that wrecker driver tell you about

13  conversations he had with Mr. Barnwell?

14  A    He recalled Mr. Barnwell and his tattoos or some of his

15  tattoos and that Mr. Barnwell was talking -- making derogatory

16  statements as African-Americans, calling them niggers; saying

17  that the country was in a bad way because it had a nigger

18  president and that something had to be done about him.

19       And the wrecker driver took this to mean that Mr. Barnwell

20  was talking -- that the president needed to be assassinated or

21  killed.

22  Q    Did you talk to other people in this investigation that

23  told you about Mr. Barnwell's intense dislike for black people?

24  A    Yes.  We talked to a number of people who talked about Mr.

25  Barnwell being very proud of being a skinhead and being a

1   racist and that he had an intense dislike for African-

2   Americans, Hispanics, and Jews.

3   Q    And are you aware in your investigation of any people that

4   have conveyed to you that they need to keep their mouth shut

5   about this investigation and not cooperate?

6   A    Yes.

7   Q    If I can back up, Agent Burroughs, when you did the search

8   warrant last week of Mr. Barnwell's house, did you find a two-

9   page documents, Books to Order?

10  A    A handwritten document.  Yes, we did.

11          MR. HARRIS:  May I approach?

12          THE COURT:  You may.

13  BY MR. HARRIS:

14  Q    Would you just read a couple of the books into the record,

15  books listed on this document [inaudible]?

16  A    It's a two-page handwritten document that contains a

17  listing -- full listing on each page of various books; some of

18  the books listed as How to Disappear in America; a Do-It-

19  Yourself Submachine Gun; How to Make Disposable Silencers,

20  Volume 1 and 2; the Do-It-Yourself Gunpowder Cookbook; the Poor

21  Man's James Bond Volume 1 and 2; Bazooka:  How to Build Your

22  Own.  And that's some of the books that are listed.

23  Q    Did you also find a book there at his house, a military

24  manual?

25  A    We did.  We found the 2007 edition of the United States

1   Army Book of Improvised Explosive Munitions -- Improvised

2   Explosive Devices, IEDs.  Yes.

3          MR. HARRIS:  May I have a moment?

4          THE COURT:  You may.

5      (Pause.)

6          MR. HARRIS:  That's all I have, Your Honor.

7          THE COURT:  Do you want to offer any of those

8   documents?

9          MR. HARRIS:  No, just the ones I --

10          THE COURT:  And what about this report?

11          MR. HARRIS:  Oh, I would offer that, Your Honor.

12          THE COURT:  All right.  That -- I'm going to mark

13   that as G-6.

14   (Document marked as Government's Exhibit 6.)

15          MR. HARRIS:  Yes, Your Honor.

16          THE COURT:  Is there any objection to G-6, which is

17   the incident report from Texas dated August 22, 2005?

18          MS. BORKOWSKI:  Not -- for purposes of this hearing,

19   no, Your Honor.

20          THE COURT:  Okay.

21   (Document marked as Government Exhibit 6 received.)

22          MR. HARRIS:  That's all I have, Your Honor.

23          THE COURT:  All right.

24      Ms. Borkowski, would you like to cross?

25          MS. BORKOWSKI:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. BORKOWSKI:

Q    Agent Burroughs, you went over the criminal history of Mr. Barnwell.  In 1999 [sic], with the first conviction, was Mr. Barnwell 17 years old at that time?

A    I'm not exactly sure of his age, ma'am.

Q    Okay.  You don't know what year Mr. Barnwell was born?

A    I know he's -- I believe he's 37.  I'd have to go back -- I've looked at his date of birth, but I don't recall what it is.

Q    Okay.  And would you agree that 1991 is 20 years ago?

A    Yes.

Q    So if he's 37 now, 20 years ago, how old would he have been?

A    Be 16.

         MR. HARRIS:  Or 17.

         MS. BORKOWSKI:  Or 17.

         THE WITNESS:  Or 17.

BY MS. BORKOWSKI:

Q    The following year he would be 18 or 19, which is the second instance.

A    Okay.  Yes.

Q    And in fact are you aware of the circumstances involving the arrest in 2006, his most recent incident?  Are you aware of the circumstances of that?

1   A    Which one is that one?

2   Q    I'm sorry.  In 2006 the obtaining property under false

3   pretense.

4   A    I do not know the details of that arrest.

5   Q    So you don't know if that was an instance where he was, on

6   agreement with his mother, pawning items that belonged both to

7   he and his mother?

8   A    I don't know the circumstances of that arrest.

9   Q    Okay.  And you would agree, would you not, that since 2006

10  Mr. Barnwell has had no instances or no convictions, no

11  arrests, until now?

12  A    I believe he's been arrested at least one time.  I know I

13  was told by a bondsman that he was arrested in Fulton County

14  for some type of charge of either DUI, public intox or

15  something like that, but I -- but other than being told by the

16  bails bondsman, I'm not aware of what the circumstances were in

17  that arrest.

18  Q    Okay.  And nothing -- and we have nothing in our

19  information that you've presented us about any other instances.

20  A    I did not find anything else in NCIC, no.

21  Q    Okay.  So for the past five years Mr. Barnwell has not had

22  an instance, that we know of, as far as being arrested or in

23  trouble with the law?

24  A    Like I said, other than this drinking incident.

25  Q    Okay.  And you talked about an instance in May of 2010.

1   Who was charged in that -- for that crime?

2   A    A guy named Jared Anderson from Missouri.

3   Q    Okay.  And Mr. Barnwell was not charged.  Is that correct?

4   A    No.  The other six occupants of the car were not arrested.

5   Independence County Sheriff's Department made the arrest and

6   only arrested Mr. Anderson.

7   Q    Okay.  And you talked about things that you found in the

8   home, and there was -- you were mentioning the books to order?

9   A    Yes.

10  Q    You have no information or belief or knowledge that he has

11  ordered those books, that Mr. Barnwell has read those books,

12  that he owns those books?

13  A    I do not know.

14  Q    Okay.  And wouldn't you agree that someone, in the privacy

15  of their own home, has the right to read, write essays,

16  practice their own belief system, regardless of whether or not

17  we agree with that.

18  A    Yes, as long as it's not in conjunction with planned

19  violence or a violent act.  Yes.

20  Q    Okay.  And let's go back to when you were investigating

21  Mr. Barnwell, this was an investigation of an isolated

22  incident.  Correct?

23  A    You're talking about the firebombing?

24  Q    Yes.

25  A    It was an investigation of that incident, yes.

1    Q    Of an isolated incident.  This was not an ongoing issue.

2    A    Well, after we began investigating that incident, it

3    appears that it has been an ongoing issue.

4    Q    Okay.  But Mr. Barnwell has only been charged for one

5    incident.

6    A    That's correct.

7    Q    Okay.  And during the two months that you were

8    investigating this case, you investigated both Mr. Barnwell and

9    Ms. Treybig, as well as others?

10   A    That's correct.

11   Q    Okay.  Mr. Barnwell and Ms. Treybig have been completely

12   cooperative with you?

13   A    They have agreed to speak with us several times.  They've

14   lied to us on each occasion, and then on one occasion, when we

15   recovered their DNA, back in February, under a subpoena, Ms.

16   Treybig and Mr. Barnwell, after submitting to the DNA request,

17   went back into the house --

18   Q    Okay.

19   A    -- but they have talked with us to some extent on each

20   time we've contacted them.

21   Q    And have they been courteous?

22   A    For the most part.  They go from being courteous to being

23   angry and then back to courteous again.

24   Q    Okay.  And have they been appropriately respectful in

25   dealing with agents?

A    I don't have any problem with their action as far as being

respectful, yes.

Q    Okay.  Has there been any evidence in your investigation

that they have attempted to intimidate someone, that they have

attempted to contact anyone in order to intimidate them?  Has

there been any evidence of that?

A    Yes.

Q    You want to elaborate?

MR. HARRIS:  Judge, I'm going to object.  This is not

discovery.  She asked a question if he has evidence of it; he

says he does.  To disclose it now I think [inaudible].

MS. BORKOWSKI:  If I can, Your Honor, he testified on

direct that there is a cooperating witness that has indicated

that he is concerned and fearful, and I'm not asking to

disclose the witness.  It's not well hidden in the affidavit

who the individuals are, but the question was -- if he is

indicating that my client should not be released on detention

because he is a safety concern to the community, my question is

where -- what's the evidence?  What attempts have my client

made to intimidate anyone? -- because I do not believe that

there have been any attempt by my client over the past two

months to intimidate anyone.

THE COURT:  All right.  I think we split the baby

here by -- because I think, Mr. Harris, that the answers --

he's going to say that he's not -- you don't know that he's

1    actually threatened anyone?

2           THE WITNESS:  The evidence that I have is from a

3    witness's statements about the intimidation.

4           THE COURT:  So where are -- Ms. Borkowski, are you

5    going to want to know who has complained that they feel

6    intimidated?

7           MS. BORKOWSKI:  A complaint that they would feel

8    intimidated because they have cooperated with the government is

9    normal.  My statement is that I do not believe -- the question

10   is I do not believe my client has been in contact or done

11   anything actively or passive-aggressively to intimidate during

12   this period of investigation.

13       He's not made contact with the victims; he's not made

14   contact with the other individuals involved in this case.

15          THE COURT:  So do you have evidence that he's made

16   contact with anyone?

17          THE WITNESS:  That through his wife or through his

18   girlfriend, Wendy Treybig, he has.

19          THE COURT:  So his testimony's going to be that Ms.

20   Treybig has, but Mr. Barnwell has not directly.  Is that --

21          THE WITNESS:  That's my understanding.  Yes.

22          THE COURT:  Does that satisfy you?

23          MS. BORKOWSKI:  That satisfies me on that issue.

24          THE COURT:  Okay.

25   BY MS. BORKOWSKI:

1   Q    I do want -- because part of the consideration for this

2   court in the detention issue is the nature and circumstances of

3   the case, in looking at your -- I guess the affidavit that was

4   submitted by Agent Land -- you are aware that this affidavit

5   was submitted as the basis for the criminal complaint?

6   A    I was.

7   Q    Okay.  And you're familiar with the facts alleged in the

8   affidavit?

9   A    Yes.

10  Q    Okay.  Isn't it true that the cooperating witness CW2 --

11  we're looking at paragraph 2 -- is the one that went into the

12  home and gathered the bottles?

13          MR. HARRIS:  May I hand the witness this, Your Honor?

14          THE COURT:  You may.

15          MS. BORKOWSKI:  Certainly.

16          THE COURT:  You're talking about paragraph 2 of the

17  affidavit?

18          MS. BORKOWSKI:  Twenty-three, Your Honor.

19          THE COURT:  I'm sorry.  Twenty-three; I thought you

20  said 2.

21          MS. BORKOWSKI:  Twenty-three and twenty-four.

22  BY MS. BORKOWSKI:

23  Q    And, again, this goes to the nature and circumstances of

24  my client's involvement.  The statement is that the cooperating

25  witness, CW2, was the one who went into the home and gathered

1    the three bottles.  Isn't that true?

2    A    Yes.  Four bottles.

3    Q    Okay.  The fourth bottle was because the same cooperating

4    witness was the one who emptied the fourth bottle.  Correct?

5    A    That's correct.

6    Q    Okay.  CW2 is also the individual who took the shirt from

7    the home and that he, CW2, later used in making the device.

8    True?

9    A    Yes, that's correct.

10   Q    Isn't it true that when the car stopped to get gas, it was

11   a different cooperating witness, CW1, that actually filled the

12   gas can with the -- at the pump?

13   A    That's what was told us.  Yes.

14   Q    And isn't it true that the gas can was in the seat between

15   the now two cooperating witnesses?

16   A    In transport, yes.

17   Q    And isn't it true that when the car stopped, CW2 was the

18   one who made the device.

19   A    He participated; that's correct.

20   Q    And CW2 was the one who poured the gasoline into the

21   bottles.  Correct?

22   A    Correct.

23   Q    CW2 was the one who inserted the rag into the bottle.

24   Correct?

25   A    And CW2 was the only one who threw the bottle through the

1   window of the residence.  Correct?

2   A    The one that went into the residence was thrown by CW2.

3   That is correct.

4   Q    Okay.  Have either of the cooperating witnesses been

5   charged in this incident?

6   A    Not yet.

7   Q    And isn't it true that both of these witnesses have told

8   officers that any animosity that Mr. Barnwell has with Lamar,

9   one of the gentlemen, stems from an inappropriate comment that

10  the gentleman made toward Wendy Treybig?

11  A    In part that's correct.

12  Q    Okay.

13          MS. BORKOWSKI:  Your Honor, I have nothing further

14  for this witness at this time.

15          THE COURT:  All right.

16      Anything further from this witness, Mr. Harris?

17          MR. HARRIS:  No, Your Honor.

18          THE COURT:  All right.  You may stand down.  Thank

19  you.

20      (Whereupon, the witness was excused.)

21          THE COURT:  Anything further, Mr. Harris?

22          MR. HARRIS:  No, Your Honor.

23          THE COURT:  Ms. Borkowski, would you like to present

24  any evidence?

25          MS. BORKOWSKI:  Yes, Your Honor.

1     If I can, I am going to start with calling Mr. Jimmy

2  Eaken.

3          THE COURT:  Mr. Eaken, would you come forward.

4     (Pause.)

5          THE COURT:  Sir, if you'll stop right there, raise

6  your right hand.

7  Whereupon,

8                      JIMMY WAYNE EAKEN

9  having been first duly sworn, was called as a witness herein

10  and was examined and testified as follows:

11                      DIRECT EXAMINATION

12  BY MS. BORKOWSKI:

13  Q    Hello, Mr. Eaken.  Can you introduce yourself to the

14  Court.

15  A    My name is Jimmy Wayne Eaken, and I was born in 1948.  I

16  was not born a native of Arkansas, but I've been living in

17  Arkansas, and in fact I've been Cherokee Village area as a real

18  estate broker for 20 years, and ten years prior to that in

19  Mountain View, Arkansas.

20  Q    Mr. Eaken --

21          THE COURT:  Would you spell your last name, just so

22  the record --

23          THE WITNESS:  It's kind of hard; it's E-A-K-E-N.

24          THE COURT:  I got close.  All right.  Thank you.

25  BY MS. BORKOWSKI:

1    Q    And, Mr. Eaken, are you -- do you know Mr. Jason Barnwell?

2    A    Yes, quite well.

3    Q    And can you -- you have written a letter --

4         MS. BORKOWSKI:  Your Honor, may I approach?

5         THE COURT:  You may.

6         MS. BORKOWSKI:  I'd like to mark this as Exhibit 1 --

7    or do I need to put a D-1?

8         MR. HARRIS:  No objection, Your Honor.

9         THE COURT:  All right.  Let's go -- it either needs

10   to be D-1 or it needs to be -- yeah, let's do D-1.

11        MS. BORKOWSKI:  D-1.  Okay.

12   (Document marked Defendant's Exhibit 1.)

13   BY MS. BORKOWSKI:

14   Q    Is this a letter that you have prepared for the Court to

15   consider?

16   A    Yes, ma'am.

17   Q    And what would you like to, in your own words -- of

18   course, the Court can look at the letter, but in your own words

19   would you tell us what you are asking for the Court to consider

20   as far as Mr. Barnwell's release on detention?

21   A    I've known Jason Barnwell and Wendy for over two years,

22   and I -- as a licensed real estate broker, I've helped a lot of

23   families move to the Ozark Mountains; very few people are

24   native up there.

25        And we -- I say we because I feel like I'm as long-term

1  resident as what most people are.  We treat all people as
2  though they're a blank sheet of paper, until they start doing
3  and being what they are.
4      In real estate, you know, we can't discriminate in any
5  manner.  We don't try to.  I have seen, in the last few years,
6  especially since Mr. Barnwell has been up in the area -- we are
7  an area that does not have much opportunity for survival,
8  economic.
9      And I've watched the two as a couple staying out of
10 trouble, to my knowledge.  Of course, I didn't do a background
11 history check, which we don't on anybody.  And it came to a
12 point in time that they were trying to move out of a very bad
13 neighborhood; it's a whole mountain.
14     And at the same time we were seeing the government giving
15 stimulus monies to help people get to own a home.  The young
16 couple -- and I helped a lot of people, at least 50 or 60
17 people that had never owned a home get their first home with
18 the help of the government stimulus money to overcome the down
19 payment.
20     See, that's the biggest problem in having a place to live
21 of your own, is coming up with the down payment, because the
22 monthly's going to be about the same as rent.
23     At that time he did not have any income, that I was aware
24 of, and Wendy was working at a bakery, and they were surviving,
25 and I mean literally just getting by with what income they had.

1      But the opportunity with the government funding allowed us

2   to help them buy a home on an owner finance.  Their credit was

3   nothing, but with the situation -- I had an owner that would

4   sell on owner finance, and the government money made the down

5   payment.

6      This was not a place, folks, that I would have lived in.

7   When we showed them the property -- when I showed them the

8   property, my exact words were, Whoever owns this needs to

9   bulldoze it down and build a house.

10     It was a dilapidated old farmhouse that had been squatters

11  living in and knocked holes in the Sheetrock, ripped all the

12  flooring out.  It just was not much to live in.  But it was a

13  step that would allow them to get a place of their own to start

14  with and do it in such a manner that they were really, really

15  tight, but they were getting by.

16  Q    And since moving in to the home and making the payments,

17  the monthly mortgage, have you witnessed Mr. Barnwell working

18  in and around the home to maintain it, to upkeep, to improve

19  the home and the property?

20  A    Definitely anything that was done there would be an

21  improvement.  First they had to do things to make it habitable,

22  making the commode work, get running water, get electricity in.

23  I have become more and more acquainted with them because I'm an

24  avid hunter, but I live in a, slash, retirement community,

25  Cherokee Village, and the property they've bought, which is

1  setting in the county and has a creek and very attractive to me

2  as a hunter, because I knew there was a lot of wildlife there.

3        And in a barter-type system, I would provide Mr. Barnwell

4  with materials from -- you name it:  Sheetrock, paint,

5  whatever, insulation, and in return I was allowed to hunt deer

6  in one part of his property that was out along the creek away

7  from everybody.

8        He's been quite helpful to me, because I had to take early

9  retirement because of COPD; I can't do some of the things I

10  used to do.  I can't drag a deer out of the woods.

11        Now, don't get me wrong.  He didn't hunt with me, but I

12  was able to kill a deer, and he did help me get it out of the

13  woods, and in return I gave him some meat.

14        He's done some work for me in residence.  We insulated the

15  entire floor under the house to save on utilities.  He's

16  wrapped all the pipes.  I'm inactive -- I had to take early

17  retirement, but in the time that I've known them, I was

18  managing rental properties for a real estate brokerage, and I

19  was able to utilize him to go in and clean up in between bad

20  renters to try to get good renters in and try to do it on as

21  economical as possible for the property owner.  And he's been a

22  good worker.

23        MS. BORKOWSKI:  And, Your Honor, if we may introduce

24  this as an exhibit?

25        THE COURT:  Any objection to the introduction of the

1    letter?

2            MR. HARRIS:  No, Your Honor.

3            THE COURT:  As D-1.  It will be received.

4    (Document marked Defendant's Exhibit 1 received.)

5            MS. BORKOWSKI:  I have nothing further.

6            THE COURT:  All right.

7        Any cross?

8                         CROSS-EXAMINATION

9    BY MR. HARRIS:

10   Q    Mr. Eaken --

11   A    Yes, sir.

12   Q    -- so Mr. Barnwell and his girlfriend were able to get

13   some government funding to purchase this property, this 11 or

14   13-acre property with a house?

15   A    Yes.  You had to be in a situation that you had never

16   owned a home, or at least for the last three years, and there

17   were some other requirements involved, but they did qualify.

18   Q    How much money did they get to buy this property?

19   A    They could get up to 10 percent or up to an $8,000 cap for

20   an $80,000 home.  This property wasn't that much, but they got

21   their 10 percent, and when the check did come -- and I point

22   this out because not all the players did this.

23       The check came to them, and not to the real estate

24   company, so they brought the check in and paid their down

25   payment money.

1    MR. HARRIS:  May I approach, Your Honor?

2    THE COURT:  You may.

3  BY MR. HARRIS:

4  Q    You know who that is, Exhibit 2?

5  A    That appears to be Jason.

6  Q    Okay.

7  A    I don't recognize the area.

8  Q    Beg your pardon?

9  A    I don't recognize the area.

10  Q    You said you've known him for about two years?

11  A    Yeah, it'd be right around two years.

12  Q    And I take it what you heard today about his prior

13  criminal history is kind of a surprise to you?

14  A    I would classify it as shock.

15  Q    Okay.  That's even bigger than a surprise, isn't it?  You

16  didn't know about all these prior convictions?

17  A    No, but --

18  Q    Did you know he'd been to prison?

19  A    Yes.

20  Q    How did you know that?

21  A    Because in our getting acquainted and trying to help him

22  with real estate, especially since we were going to be looking

23  at owner finance, I did ask him, you know, do you have a

24  criminal record.  Do you have traffic tickets?  You know, do

25  you have DWIs?  Because --

1  Q    What did he tell you?

2  A    He said that he did have a felony record and that it was

3  back years ago and was not even in the Arkansas area, because

4  as a broker, I have a responsibility to our clients, which

5  would be the people that own the home, in this case, to try to

6  provide them with the type of person that's going to not only

7  pay for it but take care of it, because if it has to be

8  repossessed, you know, you don't --

9  Q    Did you know about -- this information you've heard today

10  in court about his dislike for African-Americans?  Did you know

11  about that from your conversations with him?

12  A    No.

13  Q    Was that a surprise to you?

14  A    Yes, it was a total surprise.

15  Q    Okay.  And when they searched his house, they found a

16  number of Nazi memorabilia.  Did you know about that?

17  A    Some what?

18  Q    Nazi, N-A-Z-I, memorabilia.  Did you know about that?

19  A    Like swastikas?

20  Q    Yeah.

21  A    I've seen a rebel flag on his wall.

22  Q    Have you seen swastikas?

23  A    Not that I noticed.  I wasn't looking for one.

24  Q    Okay.  A big, ol' swastika is something you'd catch,

25  wouldn't it?

1   A    Yeah, if it was like that TV screen up there, yeah, I'd

2   notice it.

3   Q    Did you ever see a picture of that black doll hanging from

4   his front porch by a noose?

5   A    No.

6   Q    Did you see a gun or ammo over at his place?

7   A    Yes.

8   Q    When?

9   A    I was out -- actually, I was out hunting, and I saw that

10  there was a .22 out there in the barn, and I asked him if he'd

11  sell it.

12  Q    What did he say?

13  A    He didn't respond.

14  Q    And when was this?

15  A    That'd be back in December.

16  Q    Oh, you're talking about December '10.

17  A    Yes.

18  Q    Okay.  He ever talk to you about any white supremacist

19  things?

20  A    No.

21        MR. HARRIS:  That's all I have, Your Honor.

22        THE COURT:  All right.

23  Ms. Borkowski, anything?

24        MS. BORKOWSKI:  I have one question.

25        THE COURT:  Okay.

1                      REDIRECT EXAMINATION

2   BY MS. BORKOWSKI:

3   Q    Mr. Eaken, the things that you've heard today about Mr.

4   Barnwell that you did know, has it changed your opinion of him?

5   A    No.

6   Q    Okay.

7   A    No, because I know that most folks have things in their

8   past.   And in the time that I've known the man, I've not seen

9   anything that I'm afraid of.  I've loaned him tools that cost

10  hundreds of dollars, and he took care of my stuff and returned

11  it promptly.  I'm shocked.

12  Q    But you would still consider working with him, hunting on

13  his property, being friendly towards him?

14  A    Yes, ma'am.

15        MS. BORKOWSKI:   Thank you.

16        Nothing further.

17                     RECROSS-EXAMINATION

18  BY MR. HARRIS:

19  Q    Mr. Eaken, so your opinion's not changed now today, even

20  though you've heard all this stuff about Nazi swastikas,

21  dislike of African-Americans, a black doll's hanging on the

22  porch by a noose, weapons, prior convictions, committing crimes

23  in prison, being arrested in North Carolina, threatening to

24  kill black people and police officers?

25        That doesn't change any of your opinion about him.  Am I

1    correct?

2    A    No, sir.

3        MR. HARRIS:  Thank you, sir.

4        MS. BORKOWSKI:  I have nothing further, Your Honor.

5        THE COURT:  All right.  You may stand down.  Thank

6    you for being down here today, Mr. Eaken.  Appreciate your

7    presence.

8        (Whereupon, the witness was excused.)

9        THE COURT:  Anything further, Ms. Borkowski?

10        MS. BORKOWSKI:  Yes, Your Honor, I would like to call

11   Wendy Treybig.

12        THE COURT:  All right.  Ms. Treybig, if you'd come

13   forward.

14        (Pause.)

15        THE COURT:  If you'd stop right there, raise your

16   right hand.

17   Whereupon,

18                         WENDY TREYBIG

19   having been first duly sworn, was called as a witness herein

20   and was examined and testified as follows:

21        THE COURT:  All right.  Now, I am going to advise

22   you, Ms. Treybig, that anything you say the Government can use

23   against you.  I know that you've not been charged, but having

24   reviewed the file, your name appears throughout the file, so

25   I'm warning you that anything you say can be used against you.

1          And you're not required to be here, you're not

2    required to testify.  If you choose to do so, you're on your

3    own.

4          MS. BORKOWSKI:  Ms. Treybig, would you like to

5    continue with your testimony?

6          THE WITNESS:  I think I would rather not for the

7    case.

8          MS. BORKOWSKI:  Okay.

9          THE WITNESS:  I wasn't prepared for all this.  I'm

10   kind of nervous, actually.  I would like to testify that I'm

11   financially strained up with Jason gone, and --

12         MS. BORKOWSKI:  And, Your Honor, for purposes of this

13   hearing, our testimony today was going to be limited to the --

14   that she would serve as a third-party contact, as a third-party

15   custodian, that they live in the same home.  So it was -- we

16   were not going to get into any of the facts of the case.

17         THE COURT:  Well, I will tell you, I am willing to

18   limit her testimony to what we're here to talk about today,

19   which is whether Mr. Barnwell is a danger to the community.

20         But, you know -- and Mr. Harris, I don't believe, you

21   know, would intentionally lead her down a path to incriminate

22   herself, but I think he has a right to inquire of her about Mr.

23   Barnwell's -- whether he presents a danger.

24         So I don't really -- I mean I will limit it, but I

25   can't -- if you're going to put her on the stand, I'm going to

1   let him ask about danger issues.

2           MS. BORKOWSKI:  Okay.  Ms. Treybig, would you like to

3   testify, or would you preserve your right to remain silent?

4           THE WITNESS:  I'll testify.

5           THE COURT:  All right.  Any question you don't, you

6   know -- here are the rules.  You know, if there's an area that

7   you want to invoke your Fifth Amendment right -- but you don't

8   get to answer Ms. Borkowski's question about an area and then

9   tell Mr. Harris you're not going to, you know --

10          THE WITNESS:  Okay.

11          THE COURT:  -- answer his follow-up questions.  So --

12          THE WITNESS:  Okay.  Okay.

13                          DIRECT EXAMINATION

14  BY MS. BORKOWSKI:

15  Q    Would you introduce yourself to the Court.

16  A    I'm Wendy Gail Treybig, born 1/28/80, and I live in

17  Evening Shade.

18  Q    Okay.

19          THE COURT:  Would you spell your last name for the

20  record?

21          THE WITNESS:  T-R-E-Y-B-I-G.

22  BY MS. BORKOWSKI:

23  Q    And until recently who lived with you?

24  A    Jason.

25  Q    And what is your relationship with Mr. Barnwell?

1    A    He's my boyfriend.

2    Q    Okay.  How long have you and Mr. Barnwell -- you said you

3    lived at Evening Shade?

4    A    Yes.

5    Q    How long have you lived there?

6    A    Since September of '09.

7    Q    Okay.  And how long have you been living in this

8    community, in the area?

9    A    Since April of '08.

10   Q    Do you have family in the area?

11   A    My father lives in the Village.

12   Q    Okay.  By the Village you mean Cherokee Village.

13   A    Yes, Cherokee Village.  Sorry.

14   Q    Okay.  Are the two of you purchasing a property?

15   A    Yes.

16   Q    And you have a contract for sale of real estate property

17   that both you and Jason are on?

18   A    Yes.

19   Q    Okay.  And it is filed with the real estate records

20   office?

21   A    Yes.

22   Q    Okay.  Can you describe generally the property?

23   A    It's a three-bedroom, one-and-a-half bath home with almost

24   12 acres, 900 foot of creek frontage, a barn and a cellar and

25   storage shed.

1   Q    Okay.  Do you work?

2   A    Yes.  I'm the head baker at Town and Country.

3   Q    Okay.  And is that a local grocery store --

4   A    Yes.

5   Q     -- with a bakery in it?

6   A    Yes.

7   Q    How long have you been employed there?

8   A    This is -- I'm going on my fourth year.

9   Q    Okay.  Does Mr. Barnwell work?

10  A    No, not a legal 40-hour job, no.

11  Q    Okay.  Is he currently on disability for a birth defect?

12  A    Yes.

13  Q    Okay.  And does he work in and around the community?

14  A    He does, and he also works in and around the home.  It

15  needs lots of repairs and we've been making those and looked

16  forward to spring to make a lot more.  We already have the

17  material to do a lot more within the next few weeks.

18  Q    Okay.  Tell me some of the things that you guys were

19  getting ready to do this spring on the property.

20  A    We have -- the house needs to be painted in and out, and

21  we have more than half the paint already.  The pump house is

22  about a third of the way finished, and we already have the

23  materials for that as well.

24          I have a kitchen floor and a bathroom floor that need

25  to be replaced, and we have some materials for that.  We

1    haven't started completely on that yet, along with other

2    things.  There is also work throughout the community that

3    people are waiting till this spring, you know, for the snow to

4    stop.

5    Q    Okay.  And did you bring photos of the property that show

6    projects --

7    A    Yes.

8    Q    -- that you guys have going on --

9    A    Yes.

10   Q    -- and repairs?

11        MS. BORKOWSKI:  Your Honor, I would ask that we

12   introduce and have these admitted into evidence, D-2, -3, -4,

13   -5 and -6.

14        MR. HARRIS:  No objection, Your Honor.

15        THE COURT:  All right.  Those will be admitted then.

16   (Documents marked Defendant's 2 - 6 and received.)

17        THE WITNESS:  There are -- I only took a couple of

18   photos of some things; it was getting dark.  But there are lots

19   of things to do, including the living room ceiling is falling

20   out, so I need that completely torn out and redone.  There's

21   lots of things.

22   BY MS. BORKOWSKI:

23   Q    And because Mr. Barnwell's not employed outside the home,

24   where does he spend the majority of his time?

25   A    He is at home 98 percent of the time.

1   Q    Okay.

2   A    I got to work, and when I come home he's there working on

3   one project or another.

4   Q    Okay.  If you can, the exhibit number is at the bottom, if

5   you can just very briefly for each exhibit describe what is in

6   the photo.

7   A    D-2 is my half-finished pump house.  We had to get a pump

8   house in a hurry because it was snowing, so he did this

9   makeshift.  And we already have everything else to finish it.

10  It just was snowing.  So this went through the winter.

11          D-3 are our chickens, some of them, not all of them.

12  But we've been working on a chicken house, and this one rooster

13  and a few chickens.

14          D-4 is the barn that is falling apart, and it also

15  has a picture of the pile of junk that we have still acquired

16  and pulled out of the house, of the last people, the squatters

17  that were there.  The barn has lots and lots of work to be done

18  to it.

19          D-5 is another part of the barn where -- and it shows

20  windows where Jason's replaced windows throughout the house,

21  because when we moved in, there was no windows in the house at

22  all.  Also, you can see the stack of bricks and other where

23  he's working, but it's his materials.

24          D-6 is from the top of the hill, the creek that we

25  have, and down there it's a lot of cleaning to do, a lot of

1    debris is down there, leaves and stuff.  So Jason's constantly

2    cleaning down there, including he built like a little waterfall

3    down in the creek last spring, and it's washed away so we

4    wanted to try and put it back this year.  And that's it.

5    Q    Okay.  And did you also bring statements from two other

6    individuals for the --

7    A    I did.

8    Q     -- the Court to consider?

9    A    Yes, I did.

10            MS. BORKOWSKI:  Okay.

11            MR. HARRIS:  No objection.

12            MS. BORKOWSKI:  May I approach, Your Honor?

13            THE COURT:  You may.

14   BY MS. BORKOWSKI:

15   Q    I'm going to hand you what's been marked as D-7.

16   (Document marked as Defendant Exhibit 7.)

17            THE WITNESS:  Okay.

18   BY MS. BORKOWSKI:

19   Q    Can you identify who wrote this letter?

20   A    Yes, Everett Maguire is the justice of the peace for

21   Williford.  He's one of the people that Jason's worked for, and

22   still has work to be done over there at their house.  And I

23   believe his wife is on here -- yes, Fran, she's on there also.

24   Q    And can you identify what's been marked as D-8?

25   (Document marked as Defendant Exhibit 8.)

1          THE WITNESS:  Yes, this is a letter from Stacy and

2     Todd Shannon.  They've known us since the day I got my job.

3     They were -- Shannon was a co-worker, and they're good friends

4     of ours.  We take care of their daughter, they've been to our

5     home, we've been to their home many, many occasions.

6          Jason's also worked on her parents' house, and they

7     have a lot of kitchen stuff to do this spring also in their

8     home, so that's more work Jason needs to do.

9          THE COURT:  Mr. Harris, did you object to 7 or 8?

10          MR. HARRIS:  No.

11          THE COURT:  Okay.  They'll be received.

12     (Documents marked Defendant's 7 and 8 were received.)

13          MS. BORKOWSKI:  Thank you, Your Honor.

14     BY MS. BORKOWSKI:

15     Q    Ms. Treybig, if the Court agrees to release Mr.

16     Barnhill -- Barnwell, would you agree to be a third-party

17     custodian?

18     A    Yes.

19     Q    And you understand that this means if he violates any

20     conditions that the Court may impose on him, that you would

21     have an obligation to notify authorities?

22     A    Yes, ma'am.

23     Q    And you understand that if you notify of a violation of

24     the conditions, that he may be -- his release may be revoked?

25     A    Yes.

1    Q    And you're still willing to serve as a --

2    A    Yes.

3    Q     -- third-party custodian?

4    A    Yes.

5    Q    Thank you.

6         MS. BORKOWSKI:  Your Honor, I have nothing further

7    for this witness.

8         THE COURT:  All right.  Any cross?

9         MR. HARRIS:  Yes, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. HARRIS:

12   Q    Do you know what the Aryan Circle is?

13   A    Yes.

14   Q    What is it?

15   A    It's a --

16        MS. BORKOWSKI:  Your Honor, isn't this beyond the

17   scope of the direct examination?

18        The questions that I was asking her dealt with her

19   serving as a third-party custodian, that he would have a place

20   and a home to go home to.  These are things that are relevant

21   should the Court agree to release him for whatever conditions.

22        MR. HARRIS:  Judge -- I'm sorry.

23        THE COURT:  Go ahead.

24        MR. HARRIS:  I think it's pretty relevant.  If you're

25   thinking about releasing her, you need to find out some things

1    about her.  I think these questions are going to do that.

2         THE COURT:  I think that you've opened the door to

3    her fitness as a third-party custodian, but I will --

4         Are you represented by a lawyer?

5         THE WITNESS:  No.

6         THE COURT:  Which puts me -- and of course Ms.

7    Borkowski is not in a position to protect her, exactly.  I

8    think we are --

9         MR. HARRIS:  She's in a bad spot, but she testified

10   on direct and she put her character in -- before this Court

11   saying she's a good custodian.

12        THE COURT:  All right.  I'm going to ask you not to

13   ask her questions that would expose her to criminal liability.

14   I'm going to ask you to limit it to --

15        MR. HARRIS:  I'll do my best.

16        THE COURT:  -- her fitness -- I know and I -- had I

17   foreseen this, I probably would have appointed counsel for her.

18   But anyway, let's tread lightly.

19        MS. BORKOWSKI:  Your Honor, if I may, her fitness

20   should not delve into her personal belief systems.  I mean that

21   should be her protected speech that should not be held against

22   her, even if it goes against the norms of this Court.

23        THE COURT:  Well, I'm at a disadvantage, because I

24   can take a guess at what the Aryan Circle is, but I don't know,

25   and I think that if -- I don't know where this is going.  If

1    Mr. Harris is going to ask her about her participation and if

2    this is an organization with violent practices, then that is

3    relevant.

4         I just -- I mean sitting here right now, I can guess,

5    but I don't know.  So let's -- I'm going to overrule your

6    objection because I don't know what the question is, and I

7    don't know what the answer would be.

8         MR. HARRIS:  I can tell you this is going to go

9    poorly for Ms. Treybig, Your Honor.

10        THE COURT:  This is what now?

11        MR. HARRIS:  Going to go poorly for her.  This cross-

12   examination.

13        THE COURT:  Well, is it your contention that -- she's

14   indicated she does know what the Aryan Circle is.  Is it the

15   Government's position that this is a violent organization or

16   a --

17        MR. HARRIS:  It is.

18        MR. HARRIS:  -- violent -- an organization that

19   promotes violence?

20        MR. HARRIS:  It is.

21        THE COURT:  Because, you know, there's a distinction

22   between material that is offensive, and so I'm -- so I think to

23   be relevant this needs to be focused not on material that is

24   legal, even if it's offensive to --

25        MR. HARRIS:  Agreed.

1          THE COURT:  -- me --

2          MR. HARRIS:  Agreed.

3          THE COURT:  -- or you or Ms. Borkowski.

4          But if it has to do with promoting violence, you

5    know, I think that it is relevant, Ms. Borkowski.

6          And so let me hear a little bit more --

7          MR. HARRIS:  How about this, I'll ask a question.  If

8    she wants to take the Fifth, I'll let her take the Fifth and I

9    won't raise a stink about her taking the Fifth.

10          THE COURT:  All right.

11          MR. HARRIS:  And, you know, that she may testify

12    differently on direct.  How about that?

13          THE COURT:  Okay.  All right.  So the Fifth Amendment

14    to the United States Constitution says that you have a right

15    not to say anything that is going to expose you to criminal

16    liability.

17          THE WITNESS:  Okay.

18          THE COURT:  Now, I can't be your lawyer.  All I can

19    do is tell you that if Mr. Harris asks a question -- if he asks

20    a question that's just embarrassing or makes you uncomfortable,

21    you still have to answer.

22          THE WITNESS:  Okay.

23          THE COURT:  If it's a question and the answer to that

24    question is something that would expose you to a criminal -- to

25    criminal liability --

1          THE WITNESS:  Okay.

2          THE COURT:  -- in other words, so if it's a question

3  about your involvement in any criminal activity, then you

4  probably are going to want to take the Fifth.

5          THE WITNESS:  Okay.

6          THE COURT:  So -- and Mr. Harris actually is giving

7  more than he has to on this, because I think under the law the

8  door is open.  But I think that's fair, considering she's not

9  represented by counsel, and I'm uncomfortable --

10          MR. HARRIS:  She stepped up there.  She didn't have

11  to.

12          THE COURT:  I know, and I warned her.

13          MR. HARRIS:  I thought it was a poor choice, but here

14  we are.

15          THE COURT:  But we all make these --

16          MR. HARRIS:  Yes.

17          THE COURT:  -- life choices.

18          MR. HARRIS:  Okay.

19          THE COURT:  So I'm going to overrule the objection,

20  but we'll go step by step, and we're going to allow her to

21  stand on the Fifth Amendment if there is a question that she

22  thinks is going to put her in jeopardy.

23          Not -- again, if it's just embarrassing --

24          THE WITNESS:  Okay.

25          THE COURT:  -- or you don't want people to think

1    badly of you, that's -- you still have to answer those.

2            Okay.  Go ahead, Mr. Harris.

3    BY MR. HARRIS:

4    Q    What's the Aryan Circle?

5    A    It's an organization, a racist organization.

6    Q    Are you a member of it?

7    A    No.  I've not been a member for six years.

8    Q    I beg your pardon?

9    A    I have not been a member for six years.

10   Q    Okay.  So you were a member before, six years ago?

11   A    Yes.

12   Q    Okay.  Was your former boyfriend now in a Texas prison,

13   was he a leader of the Aryan Circle?

14   A    No.  But he was a member.

15   Q    Member.  Okay.  Do you have tattoos of the Aryan Circle on

16   you?

17   A    Yes, I do, but they were blued out.

18   Q    I beg your pardon?

19   A    They are blued out, which means I'm no longer involved.

20   Q    Okay.  Do you know what the ATB is?

21   A    Yes.

22   Q    What's the ATB?

23   A    Aryan Terror Brigade.

24   Q    Okay.  Are you a member of the Aryan Terror Brigade?

25   A    No, I'm not.

1  Q    Is Mr. Barnwell a member of the --

2  A    No, he is not.

3  Q    Let me finish my question.

4  A    Okay.

5  Q    Is Mr. Barnwell a member?

6  A    No, he's not.

7  Q    Is he affiliated with anyone who's a member of the ATB?

8  A    Yes.

9  Q    Who?

10 A    I'd rather not say.

11 Q    Why not?

12 A    For one, I don't know their real names.

13 Q    Okay.  Why don't you tell me the fake names of the people

14 you know who are associates of Mr. Barnwell who are

15 affiliated --

16        MS. BORKOWSKI:  Your Honor --

17        MR. HARRIS:  -- with the ATB.

18        MS. BORKOWSKI:  Your Honor, this is a fishing

19 expedition to get evidence relevant to the matter of this case.

20        What we are here on is a detention hearing solely

21 regarding Mr. Barnwell and his ability to live in the home,

22 remain in the home under conditions that this Court sets as a

23 basis for release.

24        THE COURT:  But I think that Mr. Harris is going to

25 say that Mr. Barnwell's -- if Mr. Barnwell's friends are people

1   who advocate violence, then I think that is relevant, although

2   you have -- and I don't know what the ATB is.

3          Apparently everybody else in the courtroom does, but

4   you'll have to educate me.

5   BY MR. HARRIS:

6   Q    What's the ATB?

7   A    Aryan Terror Brigade.

8          THE COURT:  Well, I got that.  And I assume from the

9   name --

10  BY MR. HARRIS:

11  Q    What does the Aryan Terror Brigade do?

12  A    I don't know.

13  Q    Have you ever -- do you know anybody who's an ATB member?

14  A    Possibly, but I haven't spoke to anybody in over a year,

15  so I don't who the members are as of now.

16  Q    Okay.  Who in Arkansas is an ATB member?

17  A    Nobody.

18  Q    Okay.  Where are these ATB members that you spoke with?

19  A    North Carolina.

20  Q    And how recently have you spoken with them?

21  A    It's been a while.

22  Q    Has it been within the past week?

23  A    Possibly.  Like I said, I don't know who members are.

24  Q    Wait.  You just said it's been over a year since you

25  talked to them and --

1   A    Yes.

2   Q    Wait, no -- and I asked you has it been a week, and you

3   said possibly.  Either -- ma'am, let me finish my question.

4              Either you've talked to them in the past week, or you

5   have not.  Have you talked to anybody from North Carolina in

6   the past week?

7   A    North Carolina, yes.

8   Q    Yes.

9   A    Yes, I have.

10  Q    How many people have you talked to from North Carolina in

11  the past week?

12  A    Three.

13  Q    And are they members of the ATB?

14  A    Not that I'm aware of.

15  Q    Do you think they are?

16  A    I don't know.  I really don't know.  I don't know how to

17  answer that honestly.

18  Q    Okay.  Do you know RAHOWA is?

19  A    I think I've read that on a website before.

20  Q    What is it?

21  A    I don't know.

22  Q    Okay.

23             MR. HARRIS:  May I approach, Your Honor?

24             THE COURT:  You may.

25  BY MR. HARRIS:

1  Q    Government Exhibit 1, do you know who that is?

2  A    Yes, that's me.

3  Q    Who is that?

4  A    It's me.

5  Q    It's you.  When was that taken?

6  A    About two, two and a half years ago.

7  Q    Where was it taken at?

8  A    North Carolina.

9  Q    Who took it?

10  A    I couldn't say.

11  Q    Who do you think took it?

12  A    It was one of our members, one of our friends.

13  Q    One of our members of what?

14  A    Of Blood and Honor.

15  Q    Of Blood Honor?

16  A    Blood and Honor.

17  Q    What is Blood and Honor?

18  A    It's an organization.

19  Q    What kind of organization is it?

20  A    A racist organization.

21  Q    Okay.  How many members are in Blood and Honor?

22  A    I do not know.

23  Q    What other -- who is Blood and Honor associated with?  Are

24  they associated with ATB?

25  A    Some, yes.

1    Q    Okay.  Is Mr. Barnwell a member of Blood and Honor?

2    A    Yes.

3    Q    Are you a member of Blood and Honor?

4    A    Yes.

5    Q    So you switched from being in Aryan Circle to Blood and

6    Honor.  Is that correct?

7    A    I didn't just switch, but, yes.

8    Q    You got switched?

9    A    No, not necessarily.  I was by myself for quite a few

10   years in the middle.  I've not been in Blood and Honor very

11   long.

12   Q    Okay.  How long have you been in Blood and Honor?

13   A    Maybe a year and a half.

14   Q    How long has Mr. Barnwell been in Blood and Honor?

15   A    I don't know.

16   Q    What do you think?

17   A    Quite a few years.

18   Q    Okay.  Is quite a few years more than 10 to you?

19   A    Yes, maybe.  I don't -- honestly I don't know.  I do not

20   know.

21   Q    And what does Blood and Honor do?

22   A    What do you mean what do they do?

23   Q    Do you get together and like you have like a moose lodge

24   and get together and drink and stuff?

25   A    Sometimes.

1   Q     Yes.  Do any of -- who in Arkansas is a member of Blood
2   and Honor?
3   A     Just Jason and I.
4   Q     You're the only two members in Arkansas?
5   A     I believe so, yes.
6   Q     Why do you say I believe so?
7   A     Well, because I don't know everybody in Arkansas, like I
8   don't know all the members of Blood of Honor.
9   Q     Okay.  How many members are in Blood and Honor?
10  A     I don't know.
11  Q     Do you have an idea?
12  A     No.
13          MS. BORKOWSKI:  Your Honor, the membership is --
14          THE WITNESS:  Yes, I'm not sure where this is going.
15          MS. BORKOWSKI:  -- it's a fishing expedition.
16          THE COURT:  All right.
17  BY MR. HARRIS:
18  Q     Let me show you Government's Exhibit 2.  Do you know who
19  that is?
20          MS. BORKOWSKI:  Which picture is this?
21          MR. HARRIS:  I think it's the one of Mr. Barnwell.
22          If I could approach, Your Honor?
23      (Pause.)
24          MS. BORKOWSKI:  Okay.
25          MR. HARRIS:  Let me show you --

1          THE WITNESS:  Okay.

2    BY MR. HARRIS:

3    Q    Do you recognize that person?

4    A    Yes.

5    Q    Who is that?

6    A    That's Jason.

7    Q    Okay.  Because Mr. Eaken thought it was, Mr. Burroughs

8    thought it was.  And so this is Jason.  That's Mr. Barnwell?

9    A    Yes.

10   Q    And do you know when that picture was taken?

11   A    No.

12   Q    Do you know where it was taken?

13   A    No.

14   Q    Do you know who took it?

15   A    No.  It was before we were even together.

16   Q    How long have you all been together?

17   A    Quite a few years, four.

18   Q    Four.  Okay.  So you think this picture is over four years

19   old?

20   A    Well, Jason had it in his possession before we got

21   together at his mother's house, so, yes.

22   Q    Okay.  And so did you know Mr. Barnwell was a convicted

23   felon?

24   A    Yes.

25   Q    Okay.  Did you know he'd been convicted as recently -- I

1   mean as far back as '92, '93, '95, 2006, all that stuff?

2   A   I didn't know the exact years, but I knew he was a felon.

3   Q   Okay.  Did you know that when that photograph was taken,

4   he was a felon?

5   A   I never thought about it.

6   Q   Okay.  Do you know it's against the law for felons to have

7   guns?

8   A   Yes.

9   Q   In May of last year -- oh, one more picture.

10         MR. HARRIS:  May I approach?

11         THE COURT:  You may.

12         MS. BORKOWSKI:  May I see this?

13         MR. HARRIS:  Sure.

14   BY MR. HARRIS:

15   Q   In May of last year, do you remember going to Batesville

16   with Mr. Barnwell?

17   A   I go to -- yes.

18   Q   You do?

19   A   Yes.

20   Q   Okay.  Do you remember going there with Mr. Barnwell, with

21   Ryan Jones, Pete, Jared Anderson, Nathaniel Watson and Teresa?

22   A   Yes.  I'm not sure if all those people were there, but,

23   yes, I remember the trip you're talking about.

24   Q   You all went in the car?

25   A   I'm sorry?

1    Q    You all went in the car together?

2    A    Yes.

3    Q    You all went to Batesville?  And this is where Jared

4    Anderson attacked that black man in Batesville?

5    A    Yes.

6    Q    Remember that?

7    A    Uh-huh.

8    Q    Okay.  Did you attack that man?

9    A    No.

10    Q    Okay.

11    A    Neither did Jason.

12    Q    Okay.

13    A    Neither did Teresa, neither did quite a few of us.  I'm

14    not sure if Nathan was there or not though.

15    Q    I could be wrong on that.  I could be wrong.

16    A    But as I recall, Jared was the only one that got -- was

17    attacking anybody or yelling anything at all.

18    Q    Who yelled, White power?

19    A    I don't remember anybody yelling, White power.

20    Q    Who yelled, I hate you fucking niggers?

21    A    That either.

22    Q    Okay.  Who yelled, We're going to kill you -- kill us a

23    fucking nigger, and get the gun out of the car?

24    A    One, we didn't ever ride with guns in the car, because

25    that's just stupid, so that was never said.

1   Q    Okay.

2   A    Two, it was my car, and I happen to know for a fact there

3   was never any guns in my car.  Ever.

4   Q    Good for you.  Good for you.

5   A    So I know that was a lie as well.

6   Q    Good.  But you were along?

7   A    Well, yes.  We were going shopping in Batesville.   It's

8   the closest store.

9   Q    Okay.  And do you remember before you all going you all

10  got together at your house?

11  A    We were all at my house for all weekend.

12  Q    And you remember saying, Let's -- somebody said, Let's go

13  to Batesville to show the white kids to be proud of their

14  whiteness?

15  A    No.

16  Q    Okay.

17  A    That doesn't even sound like anything we'd say.

18  Q    You probably wouldn't say --

19  A    We don't talk about children --

20  Q     -- whiteness, would you?

21  A    I'm sorry?

22  Q    You probably wouldn't say whiteness, would you?  I

23  think --

24  A    I'm misunderstanding you.

25  Q    I said whiteness.  You probably would not use the word

1    "whiteness," would you?

2    A    We wouldn't say anything about children at all.

3    Q    I don't think I said anything about children.

4    A    You said something about white children.

5    Q    I said --

6    A    Or teach children --

7    Q    -- oh, I said, Let's go to Batesville and show the white

8    kids to be proud of white.

9    A    Yes, see, no, we don't talk like that.  We don't have --

10   we don't deal with minors or any of that, so that would never

11   have been said.

12   Q    Well, tell me how you all talk.

13   A    Like I'm talking now.

14   Q    Okay.  Did you tell the FBI that Mr. Barnwell shot that

15   rifle two weeks ago?

16           THE COURT:  I didn't hear the question --

17   BY MR. HARRIS:

18   Q    Did you tell the FBI that Mr. Barnwell shot that rifle

19   two -- the rifle at your house, that was found in your barn,

20   that he shot it two weeks ago?

21   A    Yes, he shoots buzzards --

22   Q    Okay.

23   A    -- that attack our chickens.

24   Q    Okay.

25   A    Yes, he does.

1  Q   And you know he's a felon now?

2  A   Yes.

3  Q   Yes.  Have you told anybody not to talk about this matter?

4  A   I have told people that I would prefer the rumors would

5  stop, and if they were my friends, they would say, I don't

6  know, and a friend doesn't talk about a case or something we

7  don't know about, yes, I did say that.

8      As a fact I said that yesterday, because rumors are flying

9  all over our little town, and I'd like to go back to work.

10  I've been out of work since last week.

11  Q   Okay.  So have you told anybody not to talk to the FBI

12  about this is what I'm asking?

13  A   No, no.  No, no, no.

14  Q   Okay.  Have you told anybody not to change their story?

15  A   No.

16          MR. HARRIS:  May I approach?

17          THE COURT:  You may.

18  BY MR. HARRIS:

19  Q   Do you recognize this photo?

20  A   Yes.

21  Q   Who's the lady in the middle?

22  A   That's me.

23  Q   And who's the man on the right -- I mean on the left; I'm

24  sorry.

25  A   Oh, Jason's on the left.

1   Q     He's standing over here against the wall.

2   A     Okay.

3   Q     And who's the man on the other right?

4   A     I wouldn't know his name.

5   Q     When was this photo taken?

6   A     Maybe two years ago.

7   Q     Okay.

8          MR. HARRIS:  Your Honor, I offer this as Government's

9   Exhibit 7.

10         THE COURT:  Any objection?

11         MS. BORKOWSKI:  No objection.

12         THE COURT:  It'll be admitted.

13   (Document marked as Government's 7 and received.)

14         MR. HARRIS:  Did I give you back the other photo of

15   Mr. Barnwell?

16         THE COURT:  You did.

17         MR. HARRIS:  Okay.

18   BY MR. HARRIS:

19   Q     Do you -- does Mr. Barnwell dislike African-Americans?

20   A     I'm sorry?

21   Q     Does Mr. Barnwell dislike African-Americans?

22   A     I wouldn't say that he dislikes them; I say we prefer to

23   be around whites.

24   Q     Okay.  Does he dislike them was the question.

25   A     Sure.

1  Q    Okay.  Do you dislike African-Americans?

2  A    Sure.

3  Q    Do you hate them?

4  A    No, I don't hate them.  Hate is a very strong and ugly

5  word, and it takes a lot of emotion to hate, and you can't hate

6  something you don't know.

7  Q    Do you have a criminal history?

8  A    Sort of.

9  Q    What does sort of mean to you?

10 A    Yes.  I have forgery of a commercial instrument.

11 Q    Okay.  So when I asked you that, why didn't you just say

12 yes?

13 A    Well, because I wasn't actually doing the crime, but I

14 knew about the crime, and because I didn't report it at the

15 time and I benefitted from it, I was convicted as well.

16 Q    Okay.  What was --

17 A    And I plea-bargained.

18 Q    When was your -- when were you convicted?

19 A    In 2005.

20 Q    And what was your sentence?

21 A    Probation.

22 Q    How long?

23 A    Two years.

24 Q    Okay.  And where was this at?

25 A    In San Antonio, Texas.

1   Q    Okay.  And so did you get revoked after you got put on
2   probation?
3   A    Once, yes.
4   Q    What did you get revoked for?
5   A    Drug abuse.
6   Q    Okay.  And when you got revoked, how long did you go back
7   to prison -- or did you go to prison?
8   A    No.
9   Q    Pardon me?
10  A    No.
11  Q    Just told not to do it again?
12  A    No -- wait, you're confusing me.
13       When I was revoked and went to jail, then what?
14  Q    Okay.  You were put on probation for this felony, and then
15  you got two years' probation.  And you got revoked at some
16  point for using drugs.
17  A    Yes.
18  Q    And did you go to prison after that revocation?
19  A    No.
20  Q    What happened?
21  A    I sat in jail for quite a while, county jail, and I got a
22  new --
23  Q    What's quite a while to you?
24  A    A few months.
25  Q    Like eight, ten?

1   A    No, like three.

2   Q    Okay.

3   A    And then I got a new probation officer -- there was more

4   to the circumstance than what's being said -- I got a new

5   probation officer, and I finished my probation.

6   Q    Okay.  When was the last time you used any drugs?

7   A    I just celebrated my third year clean.

8   Q    Good for you.

9   A    I'm working on my fourth.

10  Q    Good for you.  Do you know somebody who posted on the

11  internet as Skinhead Jason?

12  A    If they did post that on there?

13  Q    No, do you know someone named Skinhead Jason?

14  A    Oh, yes.

15  Q    Who is that?

16  A    That's Jason Barnwell.

17  Q    Okay.  Is that the same person that's Skinhead in Evening

18  Shade?

19  A    I don't know.  I'm not positive.

20  Q    What website is that posted at?

21  A    Skinhead Jason I think is a Facebook or -- we haven't had

22  internet in quite a while, so I'm not positive.  I mean, I

23  couldn't tell you positively.

24       We haven't had internet in maybe a year.  We did away with

25  all internet and tried to focus more on the home and what we

were doing, not what everybody else was doing, including the

organization, which we told the FBI at the time.

Q    Okay.  So in the past you got rid of the internet, you're

trying to focus on the home?

A    Uh-huh.

Q    Is that correct?  I mean you bought a house --

A    Yes.

Q    -- with some government money that came through I guess

President Obama.  But you like President Obama because you got

this money?

A    No.

Q    I didn't think you did.

A    I have nothing wrong with President Obama.  In fact, I

think he's doing better than the last hundred presidents.  And

that doesn't matter, the color.

Q    But he is African-American.  You know that, don't you?

A    Yes.  But the white presidents we had before really didn't

do anything for us either, and they're white, so --

Q    So in the past year you tried to focus on the home.  Is

that right?

A    Yes, more or less a year or more.

Q    Okay.

          MR. HARRIS:  That's all I have, Your Honor.

          THE COURT:  All right.  Anything further, Ms.

Borkowski?

1      MS. BORKOWSKI:  I have nothing further for this

2  witness.

3      THE COURT:  All right.  You may stand down.

4      THE WITNESS:  Thank you.

5    (Whereupon, the witness was excused.)

6      THE COURT:  Anything further?

7      MS. BORKOWSKI:  No, Your Honor.  We rest at this

8  time.

9      THE COURT:  All right.  I'll be happy to hear closing

10  remarks.  Let's see; it's 3:30.  We've been going an hour and a

11  half.  Are you all good to go?  Let's go ahead and wrap this

12  up.  Unless somebody needs a break, let's go ahead and wrap it

13  up.

14    Mr. Harris, you want to make any closing remarks?

15      MR. HARRIS:  I really don't, but I'm afraid if I

16  don't, his lawyer will and I'll wish I had.  You know how that

17  goes.

18    Judge, let me just back up.

19      CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

20      MR. HARRIS:  He's charged with four offenses through

21  this complaint; [inaudible] violating civil rights is not more

22  than ten years; the interference with the housing rights, not

23  more than ten; the 844(h) is ten years consecutive, a flat ten-

24  year sentence consecutive to underlying offense, and then the

25  5861(d), the possession of the unregistered destructive device

1    is not more than ten.

2        So he's looking at three charges that are going to carry

3    some sentences, and then the 844(h) carries an automatic ten

4    years.

5        It looks also like -- you know, I think there's a

6    rebuttable presumption, because the evidence in the complaint

7    establishes that he was part of this group of people that

8    engaged in 924(c), which is having a weapon during a crime of

9    violence; the crime of violence being the use of the firearm in

10   the commission of a felony.

11       He has -- I've lost count -- six or seven felonies.  As

12   recently as last May he was going to Batesville with some

13   people, and they got in an argument and beat up a black man.

14   And he wasn't arrested, but the guy he was with did.

15       He has -- I mean, if you're going to send him back to his

16   girlfriend, she has a felony conviction; she [inaudible].  I

17   don't want to go through all this, Judge.

18       I think the evidence put on by Agent Burroughs is such

19   that there is not reasonable basis to product the community or

20   any condition or combination of things that can be done to

21   protect the community from Mr. Barnwell.  He is a danger to the

22   community.

23           THE COURT:  All right.

24       Ms. Borkowski?

25           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

1      MS. BORKOWSKI:  Your Honor, it's within your realm of
2  judgment to release Mr. Barnhill on a variety of conditions.
3  We can start with the third-party custodian, who is his
4  girlfriend; they've lived together.  They're currently making
5  payments on a home that they are intending and trying to
6  purchase, that they've worked hard on.
7      I think that the testimony is that the criminal history
8  for both of these individuals is remote in time; it's been a
9  good six years that they have been working toward bettering
10  their lives, and they are making a turn and trying to do better
11  with their choices.
12      The evidence was that during the two months that this
13  incident was being investigated, that both Ms. Treybig and Mr.
14  Barnwell have cooperated with authorities, that they have been
15  cordial, that they have been willing to do as most as they
16  should, and they have not fled the scene; that they have known
17  what the charges -- or known about this instance, and that they
18  have done what they should be doing in that instance.
19      As far as his belief system, the things that they seem to
20  have distanced themselves from, we don't know when the tattoos
21  were on them; we don't know how far back their affiliation with
22  other organizations have been.
23      What we do know is what they have done over the last five
24  years and especially within the last four years and two years
25  that they've been purchasing this property.  It's, again,

1   within your realm as far as the detention and that Mr.

2   Barnwell -- he can be put on ankle monitoring; he can be

3   restricted to the property; that if he -- that, you know,

4   there's a way that we would be immediately notified if he went

5   outside the home or outside of the property, and allow him to

6   go plant the garden and help maintain the property as this

7   couple has been doing.

8        THE COURT:  All right.

9        MS. BORKOWSKI:  Thank you.

10       THE COURT:  Thank you.

11   All right.  Congress has set out a number of factors that

12   I am advised to consider in deciding whether to release someone

13   pending trial.

14   And again, of course Mr. Barnwell is presumed innocent

15   today, and the government bears a fairly substantial burden of

16   showing by clear and convincing evidence that there's no set of

17   conditions that I can set that will reasonably protect the

18   public; not guarantee the public safety but reasonably protect.

19   This case of course presents issues -- and I can't,

20   certainly, detain Mr. Barnwell because he has views that are

21   repugnant to many people, including me, or because he

22   subscribes to magazines that I personally might find repugnant.

23   Those are not things I can consider.

24   What I do consider is the nature of the offense that's

25   charged and including particularly whether it's a crime of

1   violence.

2       I consider arson always a crime of violence, and throwing

3   an incendiary device through -- at someone's home or into

4   someone's home or participating in that is hard to distinguish

5   from firing a gun into someone's house, particularly if you

6   know that they're home.  So I do consider it a crime of

7   violence.

8       A second factor to be considered is the weight of the

9   evidence against the Defendant, and in this case the government

10  has a very strong case against Mr. Barnwell; in fact, I am the

11  judicial officer who signed the criminal complaint, so I've

12  read and studied the affidavit.

13      A third factor is the history and characteristics of the

14  person, including the person's character, drug or alcohol

15  abuse, criminal history.  He does have a criminal history.

16      It is -- I mean, Ms. Borkowski is correct that a lot of it

17  is 20 years old, and I certainly would take that into account,

18  that it -- whether the criminal history is remote or recent.

19      And then the fourth factor is the nature and seriousness

20  of the danger to any person in the community.  The troubling

21  aspect of this case, of course, is the danger of violence

22  toward a whole class of American citizens, and that is African-

23  Americans.

24      And I don't know that there's any condition that I can

25  impose that would reasonably assure the safety of black people

1  who live anywhere near, including in Batesville.

2      So with the testimony that I've heard today, I find by

3  clear and convincing evidence that there's no set of conditions

4  I can set that reasonably protect the citizens of this state

5  from this Defendant, and so for that reason I am remanding him

6  to the custody of the United States Marshal till this case is

7  resolved.

8      Anything further, Mr. Harris?

9          MR. HARRIS:  No, Your Honor.

10         THE COURT:  Ms. Borkowski?

11         MS. BORKOWSKI:  No, Your Honor.

12         THE COURT:  I'm going to let you get your exhibits

13  back.

14         THE CLERK:  I don't think that Defendant's Exhibits 2

15  through 6 were actually admitted.  Do you want to admit those?

16         THE COURT:  I did consider those.  Let me see.  You

17  know, I marked that I did.  What I don't have marked is 7 and

18  8, but I will receive those whether or not Mr. Harris objects;

19  I don't think he objected.

20         MR. HARRIS:  No, Your Honor, no objection.

21         THE COURT:  All right.  All those are received.

22      And I did consider those in coming to my decision, and I

23  will give you those exhibits back.  Of course, you're entitled

24  to appeal my decision, so you can have your exhibits back.

25      And we'll be in adjournment.

1       (Proceedings adjourned at 3:38 p.m.)

2           Electronic Sound Recording Certification

3  I, court-approved transcriber, certify that the foregoing is a

4  correct transcript from the electronic sound recording of the

5  proceedings in the above-entitled matter.

6

7  /s/ Laurel H. Stoddard              May 16, 2011
    Laurel H. Stoddard, CET             Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25